# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 7, 2013

## STATE OF TENNESSEE v. WILLIAM LANIER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-0359     James M. Lammey, Jr., Judge**

---

**No. W2011-01626-CCA-R3-CD  - Filed October 18, 2013**

---

A Shelby County Criminal Court Jury convicted the appellant, William Lanier, of premeditated first degree murder, and the trial court sentenced him to life imprisonment in the Tennessee Department of Correction.  On appeal, the appellant asserts: (1) that he was denied his right to a speedy trial; (2) that the evidence was insufficient to sustain his conviction; (3) that the trial court erred in allowing Detective Anthony Mullins to testify as a blood spatter expert; (4) that the trial court erred in admitting blood spatter evidence that was insufficiently authenticated; (5) that the trial court improperly limited defense counsel's cross-examination of witnesses; (6) that the State committed prosecutorial misconduct during its questioning of witnesses and closing argument; and (7) that the cumulative effect of the errors warrants a new trial.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Paul K. Guibao (on appeal), and Ross Sampson and Taylor Eskridge (at trial), Memphis, Tennessee, for the appellant, William Lanier.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Greg Gilbert and Katie Ratton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant was convicted of the premeditated first degree murder of his friend, Tommie Reed. Memphis Police Lieutenant William Woodard testified at trial that shortly after midnight on December 21, 2007, he was patrolling the 3400 block of Benjestown Road around the south side of Westside School in the Harvester Heights neighborhood when he saw a car parked in a deserted area. The car's windows were tinted, its lights were on, and the engine was not running. Lieutenant Woodard activated the "take-down lights" on his police vehicle and stopped to investigate the car. The driver's side door was locked, but he was able to open the passenger side door. Although it was cold outside, the inside of the car was "relatively warm." He noticed that the keys were in the ignition of the car. The victim was in the driver's seat with his body slumped over into the passenger seat. Blood was coming out of his nose, and Lieutenant Woodard saw "trauma" to the victim's head. Lieutenant Woodard thought the victim had possibly been shot. He touched the victim's neck, found no pulse, and noted that the temperature of the body was "tepid." Lieutenant Woodard backed out of the car and notified the police dispatcher that he needed a homicide detective to report to the scene.

On cross-examination, Lieutenant Woodard said that the car was "[p]inkish" in color and that he did not notice if the car was damaged. He secured the scene until other officers arrived.

Memphis Police Crime Scene Officer Demar Wells testified that on December 22, 2007, he was dispatched to 3400 Benjestown Road. When he arrived at 12:38 a.m., he saw a "purplish-colored" Mercury Grand Marquis parked in the road. The headlights were on but were dim, and coolant was pooled under the car. There appeared to be blood on the console, arm rest, and passenger seat. A Burger King wrapper, bag, and receipt were in the floorboard. Officer Wells found the victim's driver's license in the "head liner" of the vehicle. He also found a spent 9 millimeter Luger casing and a McDonald's french fry holder on the ground outside the passenger side of the car. A blue Sprint cellular telephone was in the victim's lap, and a silver camera was tucked between the seats near the passenger side floorboard. The backseat was "junky" and did not appear as if someone had recently sat there. The victim's body was removed from the car and transported to the medical examiner's office. The car was taken to the crime scene "tunnel" for further processing.

On cross-examination, Officer Wells said that he observed marks on the vehicle that may have been old gunshots and that the spots had been covered by Bondo.

Memphis Police Sergeant Anthony Mullins, who was qualified as an expert in bloodstain pattern analysis, testified that there was "high-velocity impact [blood] spatter" on the inside of the car. The majority of the blood was spattered from "the right side of the driver's seat across to the exterior of the passenger front side of the car." Blood had pooled

on the armrest "from dripping for a period of time in the same spot" before starting to "run down the surfaces." More blood spatter was in the backseat area and the rear floorboard. Sergeant Mullins said that the bloodstains on the inside of the passenger door indicated the door was open when the bloodstains were created.

Sergeant Mullins said that the victim had two gunshot wounds. From the blood spatter, Sergeant Mullins discerned that the first shot struck the victim in the right jaw. A second shot struck the victim in the center of his forehead near the hairline. The blood spatter in the backseat indicated that the victim was sitting upright when he was shot the first time. Sergeant Mullins opined that at the time of the first shot, the shooter could have been either inside or outside the car; however, at the time of the second shot, the shooter was outside the car. He explained that "[n]one of these impact spatters would be on this seat if he was sitting in the seat – or even if a portion of him was on this seat."

Sergeant Mullins said that he discovered one spent 9 millimeter Luger cartridge case under the right front seat.

On cross-examination, Sergeant Mullins said that he did not recall seeing any blood on the driver's side door. He did not know if fingerprint evidence was collected or if DNA testing was performed.

Memphis Police Detective Michael Jackson testified that in 2007, he worked with the automobile theft task force. In October or November 2007, the task force began using the victim as an informant regarding a "theft ring." The appellant was one of the individuals the victim implicated in the theft ring. Based upon the victim's information, the police arrested the appellant on December 3, 2007, and he was later released on bond. On December 4, Detective Jackson met with the victim. The victim was accompanied by a woman whose name may have been Sharita Harris.

Detective Jackson said that he last spoke with the victim the day before the victim's death. He was informed of the victim's death by Kimbercy Washington, the mother of the victim's child. After learning that Sergeant Stark was investigating the murder, Detective Jackson advised him that the appellant could be a potential suspect.

Detective Jackson said that around March 27, 2008, he received an anonymous tip advising him that the appellant might be at a house at 3447 Tutwiler in the Highland and Summer area. As Detective Jackson was driving toward the residence, he saw a red truck that was registered to the appellant's mother, Josephine McGee, parked behind the house. Detective Jackson parked on the side of the road and began surveillance on the residence. Approximately ten minutes later, the appellant drove up in a white Ford Expedition.

Detective Jackson said that he notified his unit that he had located the appellant. While Detective Jackson waited for backup to arrive, the appellant left and went to an Auto Zone store about one-half mile away. Detective Jackson followed the appellant and waited in the store parking lot. After one member of the unit arrived, the appellant came out of the store and returned to the residence on Tutwiler. Detective Jackson and the other officer followed the appellant back to Tutwiler. By the time they arrived at the residence, the entire unit had arrived. When the officers tried to apprehend the appellant, he attempted to run; however, the officers took the appellant into custody.

After the appellant was arrested, Detective Jackson went to McGee's residence and asked for her permission to search the residence, and she consented. In the appellant's bedroom, Detective Jackson found a Rafferty's restaurant employment application bearing the victim's name. Detective Jackson called Sergeant Stark and told him about the application. Sergeant Stark then obtained a search warrant for the residence.

On cross-examination, Detective Jackson said that when he informed Sergeant Stark that the appellant was a potential suspect, he also told Sergeant Stark about the other members of the theft ring, including Walter Chalmers,[1] Maridis Mason, Ernest Jones, Rodney Starks, and Christopher Criswell. Detective Jackson denied that the victim's information led to the arrest of Criswell or Jones but acknowledged that it did lead to the arrest of Starks, Mason, and Chalmers. Detective Jackson said that to his knowledge, neither Starks, Mason, or Chalmers threatened or assaulted the victim because of their arrests.

Dr. Marco Ross testified that he performed the autopsy on the victim's body. The victim had been shot twice in the head. One bullet entered the right cheek and went through the brainstem and the cerebellum, which likely caused immediate unconsciousness and may have caused "nearly instantaneous" death. Dr. Ross recovered the bullet from the inside of the skull. Because of the lack of soot or stippling around the gunshot wound, Dr. Ross determined the shot was fired from a distance of at least three feet. The other bullet entered the forehead and went through the brain and the skull. Dr. Ross recovered the bullet from the upper back shoulder area. This wound was also potentially lethal. The stippling around the forehead gunshot wound indicated the shot was fired from less than three feet. Both bullets were within the "medium caliber" range. Dr. Ross could not determine the order in which the wounds were inflicted. After testing, Dr. Ross discerned that no alcohol or drugs were in the victim's system. Among the victim's personal effects was a $10 bill.

On cross-examination, Dr. Ross said that he was unable to precisely estimate the victim's time of death.

---

[1]This individual's surname is also referred to as "Chambers" and "Charmers" in the record.

Kimbercy Washington, the mother of the victim's child, testified that she saw the victim at the Greenbriar Apartments ("Greenbriar") around 10:20 p.m. on the night of his death. He was repairing a car that belonged to "Little John." The victim was driving a pink 1998 Grand Marquis. The mother of the appellant's baby lived on the other side of the apartment complex, and the appellant sometimes stayed with her. Washington was at the apartment complex to get her baby from the victim. After Washington left the apartments, she called the victim three times to ask him to get milk for the baby. During the last conversation, which occurred between 11:00 and 11:30 p.m., the victim seemed "agitated." He told her that he needed to call her back because he was in the car with someone.

Washington said that she ordinarily did not talk with the appellant over the telephone; however, after the victim died, the appellant called her and asked if the police knew who killed the victim. When Washington said no, the appellant asked her to call him if she learned who was responsible. The conversation made Washington suspect that the appellant killed the victim.

On cross-examination, Washington said that the victim babysat that day because she had to work. She denied "that there were a lot of people out looking for" the victim. Washington knew the victim was working with the police.

Johnathan Hobson, whose nickname was "Big John," testified that in December 2007, he lived in Greenbriar and worked as a barber. He knew the victim and the appellant. The night before the victim died, the victim came to Greenbriar to work on a car owned by Hobson's brother, Johnny Anderson, who was also known as "Little John." When the victim arrived, Anderson declined the victim's services, and Hobson asked the victim to work on Hobson's car instead. The victim had his baby with him, and someone came to pick up the baby while the victim was working on the car. Once he was finished with the car, the victim went to Hobson's apartment for a haircut. Afterward, the victim and Hobson left the apartment and walked to the parking lot. The victim asked if Hobson had seen the appellant that day, and Hobson responded that he had not. The victim locked his car and walked toward the appellant's apartment.

On cross-examination, Hobson said that he was informed of the victim's death by a call from one of the victim's family members; the appellant was also involved in the call via "three way." The family member was upset with Hobson and threatened him. After the call, Hobson went to the victim's mother's house.

Keith Harris testified that he lived at 854 Carrolton and that he was the victim's brother-in-law. Harris knew the victim drove a "loud-color[ed]" Grand Marquis. On December 21, 2007, Harris saw the car drive past his house at 11:15 p.m. and proceed east

toward Old Millington Road. There appeared to be two people in the vehicle, but Harris could not see who was inside because the windows were darkly tinted.

On cross-examination, Harris said that the car was traveling away from Benjestown. Harris did not know the victim was working for the police.

Sierra Stornes testified that she had dated the appellant for a short period of time, that they had a child together, and that the victim was the appellant's friend. On December 21, 2007, the victim came to Stornes's apartment to see the appellant. The victim and the appellant went into the bedroom then left the apartment. As they left, the appellant put a 9 millimeter handgun that the victim had given him into his pocket. One or one and one-half hours later, Stornes's aunt, who also lived in Greenbriar, knocked on Stornes's door and told Stornes that the appellant had sent her to retrieve bullets.

Stornes said that she went to her aunt's residence to see the appellant. He was standing outside and appeared to be scared, nervous, frightened, or shocked. Stornes and the appellant went to a quiet room inside her aunt's house, and the appellant told Stornes that he had killed the victim. Initially, Stornes did not believe the appellant, but he swore on his father's grave that he was telling the truth.

Stornes said that she and the appellant left and returned to her apartment. Once they were inside, the appellant told her that after he and the victim left her apartment, they went to North Memphis and "ran into Ladarion." After talking with Ladarion for a few minutes, they returned to the Frayser area. The appellant told the victim to park the car around Benjestown and drew his gun "like they were fixin' to get ready to steal a car." The appellant then asked the victim "why he snitched on" the appellant. The victim asked what the appellant was talking about, and the appellant shot the victim in the head. The victim put his feet on the gas pedal, and the appellant shot him again to ensure that he was dead. The appellant said he shot the victim "[o]nce on the side, once in the forehead." The appellant threw his gun "in the water or the river" and walked to the nearby Westside High School where he removed his sweater and left it in a drainage ditch. He explained that he killed the victim because the victim was "supposed to have snitched on him like a week before – a week or two before." The appellant threatened to kill Stornes if she revealed his involvement in the crime. She believed the threat "[b]ecause he looked serious."

Stornes said that she called Crime Stoppers in January 2008 "[b]ecause I felt like that wasn't right for somebody to still be walking the streets when this man is gone." On March 9, 2008, she gave a statement to the police. On June 19, 2009, defense counsel's investigator interviewed her at her mother's house. She told the investigator that she had falsely implicated the appellant in the crime because she was angry at him for having sex with

another woman. She also told the investigator that she was able to guess where the victim had been shot by the way he looked at his funeral. At trial, Stornes maintained that she lied to the investigator because the appellant called her from jail and hinted that he wanted her to lie so that he could be released from jail and help take care of their son. Stornes said that she had believed the appellant and wanted help caring for her son. She maintained that she was telling the truth at trial because the victim's family needed closure and because her son did not need to be around someone who had committed murder.

On cross-examination, Stornes acknowledged that she initiated the conversation with the defense investigator. She told the investigator that she had lied to the police, that she did not know who killed the victim, and that she knew where the victim was shot because the "makeup was bad" on the victim at the funeral.

Stornes acknowledged that prior to the victim's death, she and the appellant fought about his involvement with another woman. However, she denied that their relationship had ended or that she had thrown him out of her residence before the crime. After the crime, she and the appellant ended the relationship, and she gave her statements to the police. She again asserted that she had lied for the appellant when talking with the investigator but that she was telling the truth at trial.

Patricia Stevenson, the victim's mother, testified that at the victim's funeral, he "[a]ppeared as though nothing was wrong with him" and that his manner of death could not be discerned by looking at him. Stevenson had never met the appellant but knew of him by the name "Poon." She said that she saw the appellant's photograph on her home computer when the victim was setting up a Myspace page for the appellant. She said that the photograph "looked like a jailhouse picture."

Marcus Orr testified that he knew the appellant and the victim. On the night the victim was killed, Orr; Orr's cousin, Ladarion Starks; and two women named Leigh Ann and Saderika were "riding around." Orr testified that he saw the appellant and the victim together that night in front of the Betty Booze Club. He estimated that the time was around 12:30 a.m. because "we was in front of the club[,] and like the club be jumping, and like usually, that's the time the club is jumping." The victim pulled his car, a pink Crown Victoria, near Orr and rolled the car window down. Orr said everyone was having a good time and that he saw no signs of violence.

On cross-examination, Orr said that he never felt any animosity toward the victim. He denied killing the victim.

The first defense witness, Darion Starks, testified that he was "riding on" Firestone

-7-

one night with Orr, Leigh Ann, and Saderika and that he saw the appellant in a car with the victim. Starks "flagged down" the victim, they parked beside each other, got out of their respective vehicles, and talked for fifteen to twenty minutes. Everyone appeared to be having a good time.

Starks said that one night in 2007, he, his brother Rodney, and the victim encountered Criswell and Criswell's girlfriend at Club Premier near the interstate. Criswell's girlfriend told them that they needed to leave because someone "was gonna shoot the car up," but she did not reveal the person's identity. The Starks brothers, Criswell, and the victim left in the victim's pink Grand Marquis. As they driving on the interstate, someone in a Ford Mustang pulled up beside them and shot at the car. The men drove to a police station and reported the incident.

On cross-examination, Starks said that he saw the appellant and the victim outside the Betty Booze Club around 11:30 p.m. the night before the victim's death. That night, the appellant told Starks that he thought the victim had "snitched on him" to the police; however, the appellant did not appear upset. Thereafter, the victim and the appellant left and drove toward the Frayser area.

Defense counsel recalled Stornes, who testified that in November 2007, she and Erica Smith discussed Smith's having sex with the appellant. Stornes said that she was not angry and that it was "a normal talk." Stornes did not discuss the victim's death with Smith and did not talk with her after November 2007.

Stornes estimated the appellant and the victim left her apartment around 9:00 p.m. and that she went to her aunt's apartment around 11:00 p.m.

Memphis Police Sergeant Joe Stark testified that after the victim's death, Detective Jackson gave him a list of eight people who were involved in an automobile theft ring and could be potential suspects in the victim's murder: the appellant, Christopher Criswell, Rodney Fulton, Rodney Starks, Ernest Jones, Maridis Mason, Darryl Ryan, and Walter Chalmers. Four of the individuals, namely the appellant, Starks, Mason, and Chalmers, were arrested based upon information provided by the victim. Sergeant Stark said that Williams and Sharita Harris told him that Hobson was in the car with the appellant and the victim on the night the victim was killed. Sergeant Stark said that he did not personally examine the blood spatter evidence because Sergeant Mullins was the blood spatter expert. The only identifiable fingerprint in the car belonged to a McDonald's employee. The print was found on a McDonald's french fry container.

Erica Smith testified that she and Stornes had been friends since they were children;

however, they were no longer friends. In December 2007, Smith lived in the apartment above Stornes. In November 2007, while Stornes was dating the appellant, Stornes's sister accused Smith of "messing around with" the appellant. Smith went to Stornes apartment, and they argued over Smith's alleged affair with the appellant. As a result of the argument, their friendship ended. Smith said that she had not been "messing around with" the appellant at that time; however, after the argument she started "talking to him" and in December 2007 conceived a son who was fathered by the appellant.

Smith said that she asked Stornes why she implicated the appellant in the killing of the victim. Stornes replied, "'Just to be lowdown.'" Smith said that Stornes was angry about Smith's relationship with the appellant.

On cross-examination, Smith said that her son was born in August 2008 and that the appellant may have fathered the child in November 2007. Smith explained that Stornes was not "confiding" in her when Stornes said she was being "lowdown"; instead, Stornes made the statement in the midst of a "heated argument." Smith did not immediately disclose the statement to police because she did not want to be involved in the case.

The jury convicted the appellant of premeditated first degree murder, and he was sentenced to life imprisonment. On appeal, the appellant asserts: (1) that he was denied his right to a speedy trial; (2) that the evidence was insufficient to sustain his conviction; (3) that the trial court erred in allowing Detective Anthony Mullins to testify as a blood spatter expert; (4) that the trial court erred in admitting blood spatter evidence that was insufficiently authenticated; (5) that the trial court improperly limited defense counsel's cross-examination of witnesses; (6) that the State committed prosecutorial misconduct during its questioning of witnesses and closing argument; and (7) that the cumulative effect of the errors warrants a new trial.

## II.  Analysis

### A.  Speedy Trial

The appellant contends that the trial court erred by allowing the State to unreasonably delay the appellant's trial for almost three years by alleging that a witness, Anthony Walker, heard the appellant make a statement against interest implicating himself in the crime. The appellant maintains that Walker's information was never "used or verified as even remotely credible." He complains that he was "forced to expend limited and costly effort, time, and resources investigating and verifying the source of the State's supposed evidence." Additionally, the appellant complains that due to the delay, his alibi witness, Nathan Carter, passed away. Accordingly, the appellant asserts that he was denied his right to a speedy

trial.[2]  In response, the State asserts that "the delay in this case was more a result of the [appellant's] actions and the necessity of full discovery[] than a denial of due process." Therefore, the State contends that the appellant's right to a speedy trial was not violated. We agree with the State.

The record reflects that the appellant was arrested on March 27, 2008.  Thereafter, on May 6, 2008, a Shelby County Grand Jury returned the indictment charging the appellant with first degree murder.  The parties initially agreed on a trial date of April 3, 2009. However, on February 25, 2009, defense counsel requested a continuance "to complete the investigation."  Thereafter, on July 9, 2009, defense counsel agreed to an August 13, 2009 "hearing date."  At a December 3, 2009 hearing, the State asked for a motions date of January 28, 2010, noting that defense counsel had "filed motions on the murder case and the robbery case."  On January 28, 2010, defense counsel "asked for a reset date of March 4th on this matter."

On April 6, 2010, the appellant's original defense counsel withdrew from representation and new counsel was appointed.  On May 10, 2010, newly appointed defense counsel announced that the parties had arrived at a tentative trial date of October 25, 2010. Defense counsel called the appellant for voir dire, during which the appellant agreed that he requested the October 25 trial date.  At a July 1, 2010 hearing, the State asked for a continuance of a report date because a family member was in the hospital.  Defense counsel agreed to the new motions date, noting that he had filed several motions for consideration.

Thereafter, on August 12, the prosecutor asked the trial court to order a mental evaluation of the appellant, noting that a supplemental police report reflected the appellant had informed the police that he was schizophrenic and not taking his medication.  The State asserted that the October 25th trial date did not need to be reset.  Defense counsel stated that the appellant "concur[red] with the need for evaluation as long as his trial date is not set off." The court admonished the appellant that he needed to cooperate if he wished to keep the October 25th trial date.

During a September 16, 2010, hearing, the appellant requested new counsel and stated, "I'm trying to go to trial."  The State responded that the appellant had refused to cooperate with the evaluation and indicated that he wanted to waive the evaluation.  Defense

_____

[2]We note that the appellant failed to provide specific citations to the record regarding his argument, aside from stating at the conclusion of his argument, "See Transcripts of the Proceedings: 11/6/08, 3/16/09, 5/10/10, and 10/25/10."  Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7).  Nevertheless, we will address his concerns.

counsel acknowledged that the appellant "should have had an evaluation done years ago." The trial court again admonished the appellant that he needed to cooperate with the evaluation in order to get his trial. The appellant asserted that he was competent to stand trial. The court agreed but said the evaluation needed to be performed. The appellant complained that he had been incarcerated for almost three years. The court responded that it was not the fault of the State that the appellant was not cooperating.

On October 26, 2010, another hearing was held. The court noted that because of the delay in completing a mental evaluation, the trial date needed to be rescheduled. Because of the crowded court docket, the parties agreed on February 7, 2011, as a trial date.

Thereafter, a hearing was held on February 23, 2011, regarding motions filed by defense counsel. The trial court noted that the trial had been reset because of a problem that defense counsel had; however, the court did not clarify the nature of the problem. At the hearing, defense counsel made a motion in limine to exclude the testimony of Sierra Stornes.

We note that "[t]he right to a speedy trial arises under the Sixth Amendment to the Constitution of the United States made applicable to the State by the Fourteenth Amendment . . . and Article 1, § 9 of the Constitution of Tennessee." State v. Bishop, 493 S.W.2d 81, 83 (Tenn. 1973). To determine whether a defendant's constitutional right to a speedy trial has been violated this court must conduct the balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972). See State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996); State v. Baker, 614 S.W.2d 352, 353 (Tenn. 1981). Under the Barker analysis, the following four factors must be considered: (1) the length of the delay; (2) the reasons for the delay; (3) the accused's assertion of the right to a speedy trial; and (4) the prejudice resulting from the delay. Barker, 407 U.S. at 530.

"The right to a speedy trial attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial." State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997). In the instant case, the appellant was arrested on March 27, 2008, and the trial commenced on February 28, 2011, resulting in a delay of almost three years. Generally, a delay of one year or longer will trigger an inquiry into a speedy trial violation. Id. However, in Vickers, this court found that a delay of three years and nine months was not a presumptive speedy trial violation. Id. Additionally, our supreme court has previously concluded that a "total delay of a little over two years is not per se extreme and is not such a length of delay that from this fact alone we would presume prejudice." Bishop, 493 S.W.2d at 85. Accordingly, we must examine the other factors involved.

The second factor, the reason for delay, generally falls into one of four categories: (1) intentional delay to gain a tactical advantage over the defense or delay designed to harass the

defendant; (2) bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defense. Wood, 924 S.W.2d at 346-47. Contrary to the appellant's assertion that the delay was caused by the State to gain a tactical advantage at trial, the record reflects that most, if not all, of the delays were agreed to by the appellant so that the parties could fully investigate the case. In fact, several delays were actively sought by the defense. As the trial court found, "[M]any of the problems that arose in this case were not the fault of the state." Accordingly, this factor weighs against the appellant.

Regarding the third factor, the appellant's assertion of his right to a speedy trial, we note that the record contains no written motion for a speedy trial. During several hearings, the appellant stated that he wanted a speedy trial. However, as the trial court noted, the appellant contributed to the delay at trial by being uncooperative with his counsel or with the doctors who were evaluating the appellant.

Finally, we must determine whether the appellant was prejudiced by the delay. Wood, 924 S.W.2d at 348. Based upon the record before us, we cannot conclude that the appellant suffered any prejudice by the delay in prosecution. The appellant maintains that an alibi witness died in November 2009. However, as the trial court noted, the appellant did not raise the issue of an alibi witness until the motion for new trial. After evaluating the applicable factors, we conclude that appellant is not entitled to relief on this issue.

B. Sufficiency of the Evidence

The appellant challenges the sufficiency of the evidence sustaining his conviction. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated

upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The appellant in this case was convicted of first degree premeditated murder, which is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation involves "an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). However, "[i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id.

"Premeditation may be proved by circumstantial evidence." State v. Brooks, 249 S.W.3d 323, 329 (Tenn. 2008). "Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment.'" State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting Tenn. Code Ann. § 39-13-202(d)). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

In the light most favorable to the State, the proof adduced at trial reflected that the appellant shot the victim because he had given information to the police that resulted in the appellant's arrest. Stornes and Starks testified that the appellant thought the victim "snitched" on him. On the day of the offense, the victim went to Stornes's apartment to see the appellant. When the two men left the apartment, the appellant took with him a 9 millimeter handgun. Orr and Starks saw the appellant and the victim together in the victim's car outside the Betty Booze Club shortly before the victim's death. About one to one and

one-half hours after leaving Stornes's apartment, the appellant went to Stornes's aunt's apartment and sent her to retrieve bullets from Stornes. When Stornes spoke with the appellant, he told her that he and the victim had driven around for a while and that they "ran into" Starks. Thereafter, the appellant confronted the victim about "snitch[ing]" on him, and the appellant shot the victim twice in the head. The police found the victim dead in his car, and he had been shot twice: once in the cheek and once in the forehead. The medical examiner determined that the victim died from the gunshot wounds, that the shot to the cheek was fired from a distance of at least three feet, and that the shot was fired from less than three feet. Sergeant Mullins found blood spatter in the car that indicated the passenger side door was open when the victim was shot. The blood spatter further indicated that the victim was first shot in the cheek, then in the forehead. Sergeant Mullins opined that at the time of the first shot, the shooter could have been either inside or outside the car; however, at the time of the second shot, the shooter was outside the car. After the victim was found, the appellant called the victim's girlfriend, Washington, seeking information about the victim's death. During a search of the appellant's mother's house shortly after the victim's death, the police found in the appellant's bedroom an employment application that bore the victim's name.

The appellant's primary challenge centers around the testimony of Stornes, which he contends "was comprised of hearsay and contradictory statements masquerading as credible evidence."[3] The appellant maintains that Stornes was not a credible witness. However, the jury, not this court, determines the credibility of the witnesses and the weight and value to be given their testimony. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). The jurors, as they were free to do, chose to accredit the evidence presented by the State. Id. In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that a reasonable jury could have concluded from the evidence that the appellant was guilty of first degree murder.

## C. Blood Spatter Expert

Next, the appellant contends that the court erred by allowing Sergeant Mullins to testify as a blood spatter expert. The State maintains that the trial court did not abuse its discretion in finding Sergeant Mullins to be qualified as an expert.

---

[3] In his sufficiency argument, the appellant summarily states that "the trial court erred in denying his Motion to Suppress Hearsay Testimony of State Witness Sierra Stornes prior to trial." However, the appellant did not support his claim with further argument, citations to the record, or citations to authority. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). Accordingly, to the extent that the appellant is challenging the admissibility of portions of Stornes's testimony, we conclude that this argument is waived. Nevertheless, we note that the trial court correctly held that the statements were hearsay but that they were admissible as statements against interest.

Generally, expert testimony must be both relevant and reliable before it may be admitted. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997). Tennessee Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

It is well-settled that "the allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987) (citing Murray v. State, 377 S.W.2d 918, 920 (Tenn. 1964); Bryant v. State, 539 S.W.2d 816, 819 (Tenn. Crim. App. 1976); State v. Holcomb, 643 S.W.2d 336, 341 (Tenn. Crim. App. 1982)). This court will not disturb the trial court's ruling absent a clear showing that the trial court abused its discretion in admitting or disallowing expert testimony. Id.; State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). This court will not find an abuse of discretion unless it "'appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Stevens, 78 S.W.3d at 832 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

During voir dire to determine his qualifications as an expert, Sergeant Mullins testified that in September 2003, he attended a week-long, forty-hour bloodstain pattern analysis school that was sponsored by the University of Tennessee and was taught by Steve Nichols and Paulette Sutton, who was a "national expert in bloodstain pattern analysis." The course

> included recreating different bloodstains, being able to document through writing, photographs, power point displays – different types of blood evidence – mock scene assessments – the differen[ce] between daytime and nighttime photography of blood evidence – recreating different types of stains on objects such as transfer stains. It culminated with teams working in mock crime scenes and presuming that as if – doing a power point demonstration in a courtroom setting.

Sergeant Mullins said that he used his specialized training "every time I make a scene." Sergeant Mullins said that he frequently consulted with Sutton regarding his findings at crime

scenes. Sergeant Mullins had testified as an expert a minimum of twelve times.

On cross-examination, Sergeant Mullins said that the course was basic and that he had not taken any advanced classes. He said that different kinds of blood spatter analysis seminars were offered for police officers throughout the nation, some of which consisted of a two-day overview. He said that after he attended the week-long course, "it's been on-the-job training for the last eight years." He clarified that he actually attended more than forty hours during the course. He said that blood spatter analysis was

> not something you would major in, in college. It's a limited need kind of thing. Not everybody needs to analyze crime scenes and bloodstains therein. But that was the one structured course I've had. I've worked with Paulette Sutton several times since then; and I've consulted with her several times since then; and I've used this information in hundreds of homicide scenes since then. I've testified in over a dozen [cases] where I've used this information within that crime scene.

The trial court found that Sergeant Mullins was qualified to testify as an expert.

On appeal, the appellant argues, in general terms, that "[t]he mere fact that a witness has more training or experience than the average person is not sufficient to qualify him or her as an expert." The appellant contends that to be an expert, "the witness must have such superior skill[,] experience, or training within a particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." Sergeant Mullins's testimony reflected that he had training in blood spatter analysis and that he had used that training for at least eight years and that he had testified in at least twelve trials. The court found that Sergeant Mullins was sufficiently qualified as an expert. We conclude that the trial court did not abuse its discretion in declaring Sergeant Mullins to be an expert witness. See State v. Aaron Malone, No. W2009-02047-CCA-R3-CD, 2011 WL 1005487, at *11-12 (Tenn. Crim. App. at Jackson, Mar. 22, 2011).

## D. Admission of Exhibits

In a brief paragraph, the appellant raises numerous issues regarding the admission of certain photographs of the crime scene, asserting that the State failed to establish a proper foundation. The appellant also complains that the Rafferty's employment application bearing the victim's name should not have been admitted because "it was irrelevant, prejudicial, and confusing." However, the appellant did not support his contentions with citations to the record or citations to authority, arguably waiving the issue. See Tenn. Ct. Crim. App. R.

-16-

10(b); Tenn. R. App. P. 27(a)(7).  Nevertheless, we note that Tennessee Rule of Evidence 901 governs the authentication of evidence.  In order to admit physical evidence, the party offering the evidence must either introduce a witness who is able to identify the evidence or establish an unbroken chain of custody.  State v. Holbrooks, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998).  The photographs at issue were properly authenticated by Sergeant Mullins.  Although he did not take the photographs, Sergeant Mullins testified that he was at the scene and that the photographs accurately depicted the scene.  Further, regarding the employment application, which was found in the appellant's bedroom after the victim's death, we note that it was relevant and established a strong connection between the appellant and the victim.  See  Tenn. R. Evid. 401, 402.  Moreover,

> prejudicial evidence is not *per se* excluded; indeed, if this were true, all evidence of a crime would be excluded at trial. Rather, what is excluded is evidence which is *unfairly* prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one.

State v. Thomas, 158 S.W.3d 361, 394 (Tenn. 2005).  Even though the application may have been prejudicial, it was not unduly prejudicial.  See  Tenn. R. Evid. 403.  Therefore, we conclude that the trial court did not abuse its discretion by admitting the photographs or the employment application.

### E.  Cross-Examination

The appellant contends that the trial court erred in restricting his cross-examination of witnesses.  Specifically, he complains that he should have been allowed to cross-examine Detective Jackson "about [the] handling of confidential informant information."  He also complains that he should have been allowed to cross-examine the "victim's mother regarding incidents of alleged violence before the victim's death."  Once again, the appellant failed to provide any citations to the record regarding his argument, arguably waiving the issue.  See Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7).  Nevertheless, we will address his concerns.

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination.  Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); State v. Brown, 29 S.W.3d 427, 430-31 (Tenn. 2000).  Denial of a defendant's right to effective cross-examination is "constitutional error of the first magnitude" and may violate the defendant's right to a fair trial.  State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)).  "The propriety, scope, manner

and control of the cross-examination of witnesses, however, rests within the discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). We will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. Dishman, 915 S.W.2d at 463.

During cross-examination, defense counsel asked Detective Jackson whether the department had a process for the "handling" of confidential informants, and Detective Jackson responded affirmatively. Defense counsel then asked if some informants were given control numbers, and Detective Jackson said yes. Defense counsel asked whether the victim was given a control number, and Detective Jackson said no. The State then objected to the line of questioning as being irrelevant. Defense counsel responded that he was "educating the jury as far as how [the police] deal[] with confidential informants – the whole process." The court stated that defense counsel could question the witness regarding whether other individuals were arrested based upon the information provided by the victim. However, the court stated that the police department's process for choosing an informant was irrelevant to the issues at trial.

On appeal, the appellant maintains that "such testimony regarding the potential dangers and alternate explanations for harm befalling confidential informants was highly pertinent to the defense's case and could have exposed evidence indicating additional reasonable doubt as to the [a]ppellant's role in the victim's death." The record reveals that through cross-examination of the State's witnesses, defense counsel adduced proof that the victim gave the police information regarding three other members of the automobile theft ring. Accordingly, the appellant was not deprived of the ability to demonstrate to the jury that other people potentially had a motive to kill the victim. Moreover, the appellant has failed to explain how evidence regarding the police department's process of handling confidential informants and the information given by the informants would have benefitted his defense. Therefore, we conclude that the trial court did not abuse its discretion by restricting defense counsel's cross-examination.

### F. Prosecutorial Misconduct

The appellant contends that the trial court "erred in allowing and failing to correct the State's improper reference to [the appellant's] prior arrests during trial and commenting on [the appellant's] failure to testify on his own behalf during closing arguments." Utilizing the "shotgun approach," the appellant summarily raises several instances of misconduct.

-18-

See Charles A. Butler v. State, No. 03C01-9207-CR-00250, 1995 WL 56357, at *3 (Tenn. Crim. App. at Knoxville, Feb. 13, 1995) ("Under the shotgun approach the appellate counsel raises a multitude of issues and fires them shotgun style at the appellate court, with the hope that one of the issues will find its mark and a reversal will be granted.").

In order to prevail on a claim of prosecutorial misconduct, the appellant must demonstrate that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, this court is guided by five factors:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984).

### 1. Prior Acts

The appellant complains that the trial court erred by allowing Detective Jackson to testify, following a Rule 404(b) hearing, about the appellant's background, criminal history, and prior arrest. The appellant also complains that the State should not have been allowed to elicit testimony from Stornes about the appellant's being in jail for a "robbery or a murder or something like that." The appellant further complains that the State improperly elicited testimony from Stevenson that she saw a "jailhouse picture" of the appellant on her computer at the time the victim was preparing a Myspace page for the appellant. The appellant contends that the trial court should have taken "corrective measures . . . to mitigate the resulting prejudice before the jury."

Regarding Detective Jackson's testimony, we note that generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In the instant case, Detective Jackson's testimony concerned the appellant's motive to kill the victim. His testimony was bolstered by two other witnesses, who testified that the appellant stated that the victim had "snitched on" him. Accordingly, this testimony was not improperly elicited by the State, and the trial court did not abuse its discretion by admitting this testimony.

Regarding Stornes testimony, the record reveals that on direct examination, Stornes acknowledged that she once told police that she had lied about the appellant's involvement in the crime because she was angry about his relationship with another woman. Stornes explained that she gave the retraction, which was false, because the appellant called her from jail and persuaded her to lie on his behalf so he could be released from jail and support their child. On cross-examination, defense counsel repeatedly questioned Stornes about her statement to the police that she had fabricated the appellant's involvement in the crime. On redirect examination, the State attempted to clarify the issue by asking if the appellant had called Stornes from jail. When Stornes said yes, the State asked, "What did he tell you?" Stornes responded, "At first he was like 'Okay, they got me locked up for murder and robbery' or whatever.'" At that point, the trial court allowed the State to ask leading questions so that Stornes would not reveal any of the appellant's prior arrests and would instead focus on his arrest due to the instant charges.

We acknowledge that the State inartfully asked the question that led to Stornes's response about the appellant being in jail for robbery and murder, there did not appear to be any improper intent behind the question. Moreover, the response would have had little effect on the jury as it only revealed that the appellant was incarcerated on the instant charges, something the jury obviously already knew. See State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987) ("Reason dictates that [the jury] must know a person on trial is either on bail or in confinement during the course of a trial."). Therefore, the appellant is not entitled to relief due to the alleged misconduct.

Next, we turn to Stevenson's testimony about seeing a "jailhouse picture" of the appellant on her computer when the victim was preparing a Myspace page for the appellant. During direct examination, the State asked Stevenson if the appellant had ever been to her house to visit the victim. Stevenson responded no. Thereafter, the State asked how Stevenson knew who the appellant was. Stevenson responded that she saw a photograph of him on her computer and that "it looked like a jailhouse picture." When the appellant objected, the State assured the court that it was finished with the line of questioning. The

court stated, "There's nothing prejudicial yet. She indicated there was a picture on a computer. She's not sure where it came from, but it was on the computer." The State explained that it was trying to establish that Stevenson did not know that the appellant was friends with the victim and that her knowledge of the appellant was limited. The State attempted to clarify the response by asking Stevenson whether the photograph related to the Myspace page the victim was setting up for the appellant. We conclude that the State did not ask any improper questions, that the State attempted to nullify the effect of any alleged error, and that the appellant suffered no effects from the alleged error.

The appellant also complains that he "was accused of being in a theft ring, despite being charged for that matter solely and without [a] co-defendant[, which] acted to heighten an image of criminal behavior." Our review of the record reveals that many of the references to the theft ring stemmed from defense counsel's cross-examination of witnesses, in which he attempted to establish that other individuals had a motive to kill the victim. Accordingly, we conclude that the appellant is not entitled to relief on this issue.

## 2. Closing Argument

Finally, the appellant complains about references in the State's closing argument concerning the appellant's lack of alibi. The record reflects that during its initial closing argument, the State made no reference to the appellant's lack of alibi. During the defense's closing argument, defense counsel suggested that "[t]here were a lot of people after [the victim]." Counsel said that some tire tracks at the scene were not investigated and suggested a third party may have killed the victim. During rebuttal closing argument, the State questioned the plausibility of the defense's third-party defense. In doing so, the State said that

> [defense counsel] tells you that his client was dropped off and that the killers went on to kill [the victim], right? You didn't hear from an alibi witness, did you? You know that the [appellant] has the power to subpoena people. You've heard from his witnesses. But you didn't hear from an alibi witness, did you?

The appellant contends that this "improper reference" suggested to the jury that "they were permitted to hold [the appellant's] decision not to testify or remain silent as to alibi against him as evidence of guilt despite the severely deficient evidence against him and contrary to the burden of proof held by the State."

The appellant also complains that the State improperly bolstered Stornes's testimony

during closing arguments by stating that Stornes "knew information that no one would know – nothing that was released" and that she "knew the order of the shots."

It is well-established that closing argument is an important tool for both parties during a trial and, therefore, that counsel is generally given wide latitude during closing argument. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). Nevertheless, "arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

Initially, we note that the appellant did not contemporaneously object to the statements. See Tenn. R. App. P. 36(a). Moreover, during closing arguments the State extensively reviewed the proof adduced during trial, and the foregoing challenged remarks were only a minimal portion of the arguments. The proof against the appellant was overwhelming, and the prosecutor's remarks likely had little, if any, effect on the jury's verdict. Accordingly, we conclude that the appellant is not entitled to relief based upon the prosecutor's closing arguments. See State v. Meeks, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993).

## G. Cumulative Errors

Finally, the appellant contends that the cumulative effect of the errors at trial warrants a new trial. However, we conclude this claim has no merit.

## III. Conclusion

In sum, we conclude that the appellant was not denied his right to a speedy trial, that the evidence was sufficient to sustain his conviction, that the trial court did not err in allowing Detective Anthony Mullins to testify as a blood spatter expert, that the trial court did not err in admitting evidence, that the trial court did not improperly limit defense counsel's cross-examination of witnesses, and that the appellant is not entitled to relief regarding any alleged prosecutorial misconduct. Therefore, we conclude that the judgment of the trial court is affirmed.

_____
NORMA McGEE OGLE, JUDGE